Good morning, and may it please the Court. My name is Andrew Koenig, representing plaintiff-appellant Alessa Buitron. And if I might request two minutes of my time for a rebuttal argument, I'd appreciate it. Sure. You should just watch the clock. I will do my best. Thank you. I'll try to help you. Okay. Well, Your Honors, this case, the critical time period is between ages of 18 and 22. This application actually was filed back in May of 2009, a few months shy of her 18th birthday. And we need for the child's insurance disability benefits to establish disability before age 22. Now, from our perspective, the two main pieces of opinion evidence for that time period is from Dr. Thurber, who was a retreating psychiatrist between ages 17 and 19 to establish the disability at that age range. And she was treated through Ventura County Behavioral Health. And then on the back side, just before age 22, within 10 days of her 22nd birthday, there was the two-day batteries of testing from Dr. Witt, neuropsychological testing. Both of those pieces of opinion evidence do establish disability, especially Dr. Thurber. When Dr. Thurber's opinions and limitations were posed at the hearing to the vocational expert, the vocational expert said if those opinions are credited, that would rule out all work. The judge, the ALJ, clearly mischaracterized Dr. Thurber's opinions in assessing them by saying she stated they were at most moderate impairments. There were three impairments that were listed as poor to none, and specifically those impairments when posed to the vocational expert resulted in testimony that it would preclude work. Dr. Thurber's opinions were also construed as consistent with those of the consultative examiner, which is Dr. Portnoff, which is who the ALJ credited in assessing the RFC finding. As far as Dr. Witt's opinions, we're asserting that the ALJ did not thoroughly grasp and assess the holistic analysis that Dr. Witt took. The ALJ focused on the IQ scores, which were in the low to borderline range, and emotional functioning tests. Those are two tests out of 12 that the ALJ focused on and rejected, but did not appreciate the battery of testing that showed in the one percentile in several areas. The ALJ must either assess the whole approach and explain while certain limitations are eliminated or not credited as part of the RFC finding analysis. What was the evidence with respect to her ability to concentrate over a period of time? Well, we have from Dr. Thurber that it was, I believe, poor to no ability to, well, those were, I believe, simple. Maintain attention and concentration for two-hour segments, ask simple questions or request assistance, and make simple work-related decisions. Those were poor to none from Dr. Thurber. They were what? Listed as poor to none. Poor to none. From Dr. Thurber, who is, again, a treating psychiatrist from ages 17 to 19. We also have severe, from Dr. Witt, severe limitations in, you know, in simple tasks, initiating responses to, you know, verbal and auditory. How many times did Dr. Witt see? Oh, Dr. Witt is the neuropsychologist. It was a battery of two days of testing in September. Of 2013. Yeah, I think 18th and 23rd, which, again, is within 10 days of her 22nd birthday. So the timing is exactly where we need to be. But he was the one who administered the test. Thurber was the one who saw her repeatedly over a period of time. Yeah, and it was the 17 to 19 at Ventura County Behavioral Health was Thurber, and then she was transitioned as an adult to Dr. Millstone. Unfortunately, he had only seen her twice by the time, right before the hearing, the transition took place. And then it went up and down to federal court, and Dr. Witt did the neuropsych testing at age 22 after the first remand from court. So that's the sequence of treatment. We remanded the first time. Why? Well, actually, it was a stipulated remand. Stipulated. Yeah. To reopen the record? Yeah, exactly. But what was the reason to remand the first time around that you all stipulated? Well, again, there were several grounds, but a lot was to reassess treating physician opinion evidence. What evidence can you point to in the record that Ms. Butron's noncompliance with medication is a symptom of her illness? Well, the decisions she makes in life are that, and this is something that I think was severely overlooked, was the third-party evidence from Gloria Mills. She describes her very, very accurately, in my opinion. She was? The aunt. The aunt. She acts like a 13-year-old in many ways. She doesn't brush her teeth without prompting. She will not bathe more than once a week without prompting. She makes these decisions. She was not going to take medication unless somebody puts it in front of her. She will not go to doctors unless someone puts her in the car and goes. She's that maturity level of decision-making. And no, no doctor has said she's noncompliant because of these poor decisions, but her actions speak volumes as far as. . . And it's clear she has a number of issues, but she was enrolled at a community college and held a part-time job. Okay. So I'm just trying to see how that reconciles with your statement that her daily activities support her being totally disabled. Well, as far as the school, I think I've covered that in a brief, hopefully with a little well-received humor, but she attended classes. She did not succeed in classes. She was not enrolled as a full-time student. Oh, no, no. She took Tai Chi, and she did take an English class, never succeeded. Anyone can enroll in a local community college, and she should be commended for that. But did she ever get any credit for any of those classes? I don't think she completed anything, and she certainly hasn't made any progress to any kind of AA degree, if that's what you're asking. But she tried and failed. And this job is the hardest thing for me to swallow. This was a job with a job coach assigned through Tri-County's Regional Center who helps people with disabilities try to integrate into the world. And she had to do that with a job coach folding napkins, putting silverware together and folding them up, and needed a job coach to do that, and she still didn't succeed. And we have an RFC finding for simple routine tasks. It does not get any more simple routine than that, and she couldn't do it without assistance of an assigned job coach. She had to have him pick her up a lot of the times to get her there, and she still didn't succeed. And what was it that the ALJ said that she could do? Oh, the jobs? Yeah. It was assembler and hand packager. And, you know, those are simple routine tasks. This is the generic finding I see repeatedly, simple routine tasks, occasional public and coworkers. And we have, even the CE has more specific limitations than are integrated into such a general. And her treating physician said that she couldn't concentrate or hold her attention for two hours. Two-hour segments, yeah. And even Dr. Millstone, who, again, that was the most problematic opinion evidence we got for a few reasons, but also said the same thing. Well, he said it was a significant limitation but not precluded in that area. Did you want to save the balance? I'm sorry? Appreciate it. Thank you. We helped you. We helped you use the time. Good morning, Your Honors. Good morning. Jeffrey Chen. Good morning. Jeffrey Chen, appearing on behalf of Acting Commissioner Nancy A. Berryhill. May it please the Court. Your Honors, I wanted to start by explaining and clarifying a few important points brought up in the line of questioning earlier. Actually, if you look at the opinions of Judge, sorry, Dr. Thurber and Dr. Millstone, claimant completely ignores the actual synthesis of the doctor's own findings, titled Medical Source Statement Mental. This is found on page 508 for Dr. Thurber and 474 for Dr. Millstone. Dr. Thurber, in fact, checked off that claimant was no more than moderately limited, moderately limited in her ability to maintain attention for two-hour spans, complete simple tasks, handle ordinary stress, and was, in fact, only mildly limited in her ability to. . . You're on page what? I'm sorry. The Dr. Thurber's opinion Medical Source Statement is on 508 of the administrative record, moderately limited in the ability to maintain concentration for two hours. Dr. Millstone found an even lesser. . . But Dr. Thurber also, in terms of limitations, said she was poor. I mean, classified her as poor. Is that right? Yes, Your Honor. And said, you know, she maintained attention for a two-hour segment, made simple work-related decisions, asked simple questions or requested assistance. He also noted she's likely to be absent from work three times a month and often suffers from deficiency of concentration, persistence, or pace, resulting in failure to timely complete tasks. Oh, yes, Your Honor. Well, two things. In regards to the three days of miswork, the ALJ specifically rejected that portion, which I can address if Your Honor would like. However, in terms of the general opinion, there was indeed the checkbox limitations that you're referring to of 16 categories. But Dr. Thurber synthesized that opinion in the summary medical source statement mental findings, concluding that despite those checked-off limitations, that claimant is no more than moderately limited in specific abilities, such as to maintain attention for two-hour spans, complete simple tasks, and handle ordinary work stress. This is on 508. And claimant does not address the fact that this is Dr. Thurber's own statement and own synthesis of her treatment records. And so the ALJ did not incorrectly conclude that Dr. Thurber's own statement that claimant suffered at most from moderate limitations, this is, again, on 508, is consistent with the ALJ's RFC findings. You know, I just, it says, this is, you're talking about Dr. Thurber? Yes. Because he writes moderate response to still very impaired in adult life skills and social skills. It's after the 16 check-offs. If you continue, I believe it's 25F. I saw that. But I'm looking at what he wrote. So when you take the check-offs and you compare, you don't know what kind of scale he's using, really, on the check-offs. But when you read his words, you know what he's saying. Well, with respect, Your Honor, to the extent that there's any ambiguity, the ALJ did reasonably interpret, you know, the check-box scale includes, you know, mild, moderate, I believe, market, and extreme. I still don't understand because you're arguing that Dr. Thurber's opinion was generally consistent with Dr. Portoff's opinion when Dr. Thurber rated Ms. Buton as poor and Dr. Portoff rated Buton as moderate in the same exact areas. I don't understand how that's consistent. I mean, and that's what we're looking for to see whether or not the ALJ, whether his decisions were supported by specific legitimate reasons. And I'm having a little difficulty with that. Oh, yes, Your Honor. If I could explain, the ALJ and the Commissioner's position is basically that Dr. Thurber's RFC findings encapsulated in the medical source statement mental, which found entirely moderately limited or mildly limited. This is consistent with Dr. Portoff's conclusions also finding, for example, moderate limitations in concentration persistent pace and moderate. Go ahead. I want to ask you a question when you get through. When you're through. Oh, sorry, yes. And so if you look at the synthesis of Dr. Thurber's opinion and compare it with the conclusion of Dr. Portoff, they both found, you know, mild to moderate limitations, and that is why the ALJ found them consistent. Again, the medical source statement is from Dr. Thurber's own synthesis, so I think the ALJ is reasonably entitled to Dr. Thurber's own translation. This is not simply the ALJ making his own conclusions. This is in reliance on Dr. Thurber's own conclusions. Yes, Your Honor. Now, Shays Alisa, currently 25 years of age. I believe so, Your Honor, yes. And since three, three years of age, she's been mentally disabled. And throughout schooling, she was enrolled in special education cases. She has no history of gainful employment. She lives with her mother and depends on her mother for care. She does have a close relationship with her aunt, Gloria. And she suffers from depression, borderline intellectual functioning, learning disabilities, attention deficit hyperactivity disorder. Oh, yes, Your Honor. What? She's never had a job, has she? No, Your Honor. I don't believe there was pastoral work. Never worked. So, you know, and it can go on and on. And doctors go and they check this and they check that and they check everything else. But, you know, if I ever saw a case that merited leave, this is one. Well, Your Honor, if you allow me, with respect, if you want to move away from the opinions briefly, yes. There's no question that claimant, you know, had borderline intellectual functioning and was in special education. The commissioner does not dispute that or that she has significant limitations. The question is whether the record supports a total inability to do work, even though she has had no pastoral work. If I could point you, Your Honors, a significant issue in this case is the claimant's ability to perform work when she was compliant with medications. Let me point you to the longitudinal treatment history briefly. You know, in 2007-2008, a claimant was compliant with treatment and was noted to be doing very well, emotionally engaging better, more socially focused, less moody. Right around the time, and this is on page 367 and 368, now right around the time Dr. Thurber and Dr. Milestone issued their opinions in May 2011, a claimant reported that she was feeling great on medications and attending a job training program regularly. In July 2011, a claimant continues to continue on prescription doing well and reported that she was frustrated that she could not find a job. In October 2011, she appears to be doing well. The doctor said she had no obvious situation or emotional challenge, was enrolled at Ventura College, and was taking three courses, including psychology. This is significant because college attendance- Did she finish those courses? There was no evidence that she completed a degree or anything. Because she was enrolled in a lot of different courses, as you heard reference to one of them. I'm not sure that that is sufficient to support, I think, what you're trying to say. I was looking at Dr. Witt's opinion. It looks like the ALJ, in discrediting Dr. Witt's opinion, if you could answer this for me, only discussed two of the numerous tests performed by Dr. Witt. There were numerous tests. Was this error just to discuss two? Doesn't he have to do more? The ALJ? No, Your Honor. Actually, the reason the ALJ focused on the IQ test is because it is inconsistent with the earlier and current testing, and this was the ALJ statement on 540. If you look at the statement of Dr. Witt, Dr. Witt found that testing of borderline intellectual functioning invalid, stating that the claimant was actually less functional, whereas the other opinion of record, for example, Dr. Sanchez noted on page 260 that the test scores may be a mild underestimate of claimant's actual abilities. Dr. Graf on page 256 questioned whether a claimant was actually development disabled, and Dr. Portnoff found that claimant's average verbal and perceptual IQ scores inappropriate for a primary BIF diagnosis. So what the ALJ is trying to say is that Dr. Witt rejected these testing IQ scores, which are contrary to these three other doctors that found, if anything, they to be a mild underestimate, and, in fact, gave other reasons. If the ALJ had said what you said, maybe so, but that's what you're saying, what the ALJ was trying to say. He didn't really – I don't know if he really said it. But let me ask you one last question before your time is up. What were the specific reasons germane to each of the witnesses that the ALJ provided in disregarding the testimony of Ms. Butron's aunt and mother? Well, the ALJ's specific statement was that, you know, the opinion of the physicians and mental health professionals are likely more professional, as discussed earlier, they found moderate and mild limitations, and less likely to be influenced by sympathy or their emotional factors. Now, this is not an abstract reason. I'm talking about the relatives. Yes, this is the ALJ's statement about the lay witnesses. It said they were less likely to be influenced by sympathy. They were swayed by sympathy. Or their emotional factors. And there is actual evidence. Based on their family relationship. Actually, Your Honor, there's actual evidence in here that this was more than just, say, a lay witness or a family member giving testimony. Dr. Parsa noted that Clayman's aunt, Gloria Stills, was very specifically concerned that she had been rejected for SSDI and now has a lawyer, that the family wants her to be in treatment. And at the administrative hearing, she specifically agreed that she had been one of the driving forces. What did the ALJ say? What did the ALJ say? The ALJ specifically said that the statements were rejected because the lay witnesses are less reliable than the physicians and mental health professionals and are less likely to be influenced by sympathy or other emotional factors. Did he say why? That is the explanation for. I mean, that was it.  Okay. And I'm attempting to explain that, you know, there are specific reasons why the ALJ found the Clayman's aunt to be influenced by such emotional factors, as I've explained in the brief. If there's no further questions, Your Honor, thank you very much. Thank you. Well, picking up on that last point, neurological, psychological examinations over two days cost money. We have a mother who's on and off welfare, and we were fortunate to have an aunt step up and get the testing she needed that was extremely revealing. And it framed the time frame exactly how we needed it. Right before age 22, we have the evidence from age 18. We have the evidence from age 22 because Ms. Sells stepped up. We have a burden to produce after that. He did the ALJ. He didn't say that she lied. Oh, no. He just said, well, she wants to help her. It's a boilerplate sweeping. It would give a carte blanche reason to reject any family member testimony in every case if that was seen as a valid, germane reason. As far as the accusation that Dr. Witt found the testing invalid, that's not the proper context of the invalid. And I'm just going to have to refer you to page 175 of the record for the full context of that quote. As far as the synthesis argument, we have one form that has 25 specifics, and then the Social Security one-page form has eight or seven specific limitations. We do have a conflict. I'm not using either of these forms anymore, but on one there was a moderate attention, and then on the other we have poor to none. But I do believe Judge Schroeder was correct in looking at the narrative explanations, and that puts it in the correct context. And that, to be quite frank, the synthesis argument is nothing articulated by the ALJ. This is post hoc rationalization that should be rejected. The only specific thing that the judge rejected from Dr. Thurber is the missing three days a month. The rest just totally overlooked and characterized it as at most moderate limitations, which is not an accurate representation of her opinion. All right. Thank you very much. Anna, thank you. All right. Thank you both for your arguments here today. The case of Alyssa Boutron versus it's no longer Carolyn Colvin. It's Nancy. That's okay. Will be submitted.
judges: Schroeder, Pregerson, Murguia